**HARDWARE DEALERS MUTUAL FIRE INSURANCE COMPANY, Appellant,**

v.

**Frank OVALLE, Appellee.**

**No. 630.**

Court of Civil Appeals of Texas, Corpus Christi.

July 29, 1971.

Rehearing Denied Sept. 9, 1971.

———————

Branscomb, Gary, Thomasson & Hall, Richard A. Hall, Corpus Christi, for appellant.

Edwards & DeAnda, Joe K. Longley, Corpus Christi, for appellee. ·

## OPINION

SHARPE, Justice.

This appeal is from a judgment rendered after non-jury trial in a workmen's compensation case. Appellee Ovalle sought total and permanent disability benefits resulting from an accident on October 21, 1968 which he alleged caused severe and disabling injuries to his right leg, back and body generally. The trial court awarded Ovalle disability benefits amounting to $3,711.32 for temporary total loss of use of his right leg and $90.00 for unpaid medical expenses.

In response to appellant's request the trial court filed findings of fact and conclusions of law. Finding of fact number 5 reads as follows:

"As a result of the accidental injury of October 21, 1968, Frank Ovalle sustained temporary total loss of use of his right leg which continued and will continue from October 21, 1968, for a period of one hundred fifteen (115) weeks and has sustained or will sustain no other disability, either temporary or permanent, or partial or total."

On the basis of that finding the trial court concluded that Ovalle was entitled to recover $3,711.32 after allowing credits for payments previously made by appellant and considering interest and the appropriate discount for lump sum payment.

Appellant asserts three points of error in substance that the evidence is legally and factually insufficient to support the finding and judgment of the trial court that Ovalle sustained a total loss of use of his right leg for 115 weeks following the injury of October 21, 1968.

Five witnesses testified on the trial of the case, three for appellee and two for appellant. Aside from his own testimony appellee offered that of Dr. George B. Barnes and that of one of his attorneys, the latter testimony not being material to disposition of this appeal. Appellant offered the testimony of Mr. Bill Carper and Mr. Joe Benson, former employers of appellee.

Appellee, Frank Ovalle, testified in substance as follows: On October 21, 1968, he was about 19 years old and was employed by Sinton Electric Company as a laborer. On that date he got out of his truck to close a gate. The truck rolled backward and caught him between it and the gate, which was made of mesquite posts connected by wire. Ovalle was pushed against the barbed wire and his right knee and back were injured. He was brought to the Sinton Hospital and remained there about a week. He stayed off work for about two months but resumed his duties with Sinton Electric during January of 1969. He then performed generally the same kind of work he had done before. On occasions he would not dig ditches because his back or his knee would interrupt him, but he performed other work such as tamping dirt and sending materials up to linemen on poles. Occasionally he would miss work when it rained and sometimes his back would cause him to miss work. He earned the same wages as he had before the accident. Ovalle continued to work at Sinton Electric until June 1969 when he quit. He had gotten into a fight in which he hit a man with a chair and as a result his father thought he should leave town for a while. He was not fired from his job. He was not then married.

He proceeded to West Texas where he lived with his grandmother. While there he chopped cotton, working about ten hours a day, five days a week, and earning $40.00 to $50.00 a week. He returned to Sinton in October, 1969 and first went to Sinton Electric to seek employment because that was the kind of work he wanted and for which he thought he could apply. Sinton Electric had no work available for him. He has been back seeking his old job at Sinton Electric three or four times since his return from West Texas. He then went to work at a filling station for about two weeks, earning $55.00 a week. He was laid off because work was slow and he had been the last man hired, not because of any physical inability. Next he went to work at A&R Pipe, a company which made up pipe connections. He worked eight hours a day most of the time, five and sometimes six days a week and earned $1.70 an hour, which was more money than he had earned with Sinton Electric. He did this kind of work for about six months and, again was terminated because the work got scarce. He then went to Corpus Christi and worked for a commercial painting company—Roy Hunt—working as a laborer. He was paid $1.60 an hour which was about the same as he was earning with Sinton Electric. He left this job voluntarily when a job became available with Joe Benson in Sinton, Texas, where Ovalle lived. Benson was a tree trimmer and paid Ovalle $2.00 an hour. When Ovalle was not trimming trees he did roofing work and plumbing. Trimming trees would require him to work on the ground occasionally and sometimes he would climb trees and ladders. He performed all of the work Benson had asked him to do. The same was true with A&R Pipe—he did all of the work his foreman asked him to do, and he said the same was true with respect to Sinton Electric and Roy Hunt. He was fired from the job with Benson after Benson asked him to take a truck into town for repairs and Ovalle delayed in returning it. Ovalle testified there was trouble with the gears catching. His termination had nothing to do with any physical disability. Ovalle then went back to work for A&R Pipe again and worked for another three or four weeks earning $1.70 an hour. From his return to work in January, 1969 to the date of trial, on December 15, 1970, Ovalle was not out of work for any long period of time and when he was not working he was looking for another job. He got married sometime in 1970, the same year in which the case was tried and it wasn't until then that he moved out of his father's house. Concerning complaints, Ovalle testified that his knee had bothered him every two or three weeks and that when this occurred he would apply Ben-Gay ointment to it. It never caused him to quit a job and he was able to do his work most of the time. During the interim between the accident and the date of trial, he had taken a physical examination for the Army and had been rejected, but not because of his knee. Ovalle said he thought he weighed about 245 pounds and was about 5 feet, 11 inches tall. He said that he takes care of his own yard and makes all repairs around his home. He was not working at the time his deposition was taken in October of 1970, but said at that time that he wanted to get the deposition part of his lawsuit out of the way before he took another job, and he did go back to work with A&R Pipe Company following his deposition. On direct examination, Ovalle testified that when he went back to work for Sinton Electric in January of 1969 doing the same kind of work, his back and occasionally his knee would interrupt his work, and that they were painful, and that on occasions his knee locked on him. He also said that his back or his leg or both "bothered him" on each of the jobs at which he had worked since the accident. While he was working for A&R Pipe Company, his most recent job, his back and leg felt better. Ovalle also said that he had to work in order to support himself. Ovalle did not see a doctor from the time he went back to work for Sinton Electric in January, 1969 until November, 1970 after his deposition was taken in this lawsuit.

Dr. George Barnes, an orthopedic specialist, testified in substance as follows: He examined Ovalle on one occasion—November 20, 1970, which was over two years after the accident and about 45 days prior to trial of the case. At that time the doctor took a history from Ovalle and conducted an orthopedic examination. The history given to Dr. Barnes was partly inaccurate, at least to the extent that he was told that Ovalle was unable to return to work for six or eight months following the accident. With respect to the injury to appellee's right leg, Dr. Barnes testified that according to the history given him "the patient * * * has continued to have pains in the right knee, characterized by episodes of locking and tenderness over the lateral aspect of the knee joint." Dr. Barnes further testified to the presence of a "loose body over the lateral aspect of the right knee joint" which could be made "to move in and out of the joint" and which could be felt and moved easily. The doctor's testimony with regard to the x-ray marked plaintiff's Exhibit Number 1 was that the "loose body" appears as a "little round whitish mass." He further stated " * * * it appears that there's been a fracture at the lateral margin of the tibial plateau which has caused this loose body. Another situation which also is probably present, is damage to the lateral meniscus, which makes it sort of a compound type fracture." The doctor testified that his opinion as to the cause of the "loose body" was that "it was due to a fracture of the outer margin of the lateral plateau of the right tibia" which, in medical probability, was received "when his leg was crushed." The doctor stated that in x-rays of 1968, the loose body was about the size of a small "birdshot" but, in two years, "had grown at least four times in size." In the doctor's opinion, there was also some probable damage to the cartilage of Ovalle's right knee which, if present, was probably caused by the injury on October 21, 1968. The doctor testified that appellee would be a "hazard to himself and others" in doing work requiring walking, bending, stooping, lifting, and being on his feet; and the doctor would not pass him for "employment" or "military service". Dr. Barnes' opinion, based on reasonable medical probability, was that the injured right leg of Frank Ovalle was one hundred percent disabled at the time of trial. The doctor also stated, in his opinion, Ovalle was presently suffering from total loss of use of the right leg, based on the definition given by counsel for appellee. When cross-examined by counsel for appellant, Dr. Barnes described the subjective complaints of Ovalle as "pain and locking of the joint" and "pain over the outer side of the right knee joint with episodes of locking." The doctor further stated that Ovalle "can't straighten his knee, or his knee becomes unhinged and it's a very unstable situation." The doctor also testified that "You can put that loose body in and out of the joint as frequently as you want. It goes in and out very easily, and I'm sure, just on the basis of objective findings, what he is telling me is the absolute truth." Appellee concedes that the history of Ovalle's injury was inaccurate to the extent that Dr. Barnes did not know that Ovalle returned to work about two months after the injury. The doctor stated that this made no difference in his evaluation of Ovalle's disability. None of the questions asked by counsel for appellant changed the answers of Dr. Barnes or his opinion as given on direct examination by counsel for appellee. The doctor further testified that, even if Ovalle underwent corrective surgery, he would still suffer from a fifteen percent "functional" disability as far as the loss of use of his right leg but didn't think that Ovalle would have any difficulty in obtaining and retaining employment once his condition was fixed, and that he could then get a job and could work as in the past. Dr. Barnes further testified, on cross-examination, that he would not pass Ovalle for employment because:

"This situation is dangerous to this man and any other working man around him. You described an episode upon the roof, this is the type of thing, if the knee

buckles on him on the roof and he falls off and really seriously injures himself, of course I'm sure that some employer would be liable, but that would mean a long waste of this man's abilities. He's got a problem which right now, I think is completely disabling to that right leg, but it can be corrected by surgical procedure, which is not considered to be dangerous and which should rehabilitate him to get back to work."

On cross-examination Dr. Barnes also said that while examining Ovalle he had him lean forward, touch the floor with his fingertips keeping his knees straight, bend laterally, put his hands below his knees on lateral bending, hyperextend his spine, and that Ovalle did all of these things without complaints. He said that so far as the loose body he described was concerned, it was a very small piece of bone—a chip which had quadrupled its size in the two years since the injury. At no time did Dr. Barnes say that Ovalle's knee had been totally disabled continuously since the date of the injury or that this initially small chip was calculated to produce loss of use of the right leg from the date of the injury to the date of trial. Also on cross-examination, the doctor said that so far as his conclusions were concerned, it made no difference whether Ovalle was off work two months or eight months and that it made no difference whether he returned to work and did the same kind of work he had done previously so far as disability was concerned. He did not directly answer a question inquiring as to whether his conclusion as to Ovalle's ability to work would have been different had he known of all of the types of work Ovalle had in fact done since the date of the injury. Dr. Barnes also testified that Ovalle's leg was subject to correction by a surgical procedure not considered to be dangerous which should produce an excellent result. He agreed that what he was saying was that Ovalle had been working with a handicap that ought to be corrected.

Appellant's witness, Bill Carper of Sinton Electric Company, testified in substance as follows: When Ovalle returned to work after his injury he complained of being sore and was allowed to do easy work for about a month or so. Thereafter, Ovalle did about the same type of work as he was doing before, and never complained again to Carper after that first month, never limped and never gave any indication of having any problem at all from a physical point of view. Carper said that Ovalle disappeared one day and never came back, and that Ovalle has asked to return to his old job on two or three occasions but has not been taken back because he was not the best hand in the world and that there was no need for an additional employee at the time he inquired.

Appellant's witness, Joe Benson, the nursery man for whom Ovalle worked, testified in substance as follows: That Ovalle started working for him on about August 12, 1970, shortly after Hurricane Celia. He said that Ovalle operated a chain saw most of the time getting rid of hurricane debris and that the work involved climbing, which Ovalle did. During the two months Ovalle worked for Benson (from about August 12 to October 12, shortly before his deposition) they also put a roof on a house, tore down some blown-over derricks, towers and tanks, worked on a well, demolished some buildings, and that all of Ovalle's work was satisfactory. On no occasion did Ovalle tell Benson that he was unable to do a particular kind of work. Instead, he performed all of his work without complaints of any kind, even though much of it was hard to do, such as the time they were raising a house to put a foundation under it. Benson said that but for Ovalle's disappearance with the truck and failure to return on the day he had been sent to town, Ovalle possibly would still be working for him today.

In Travelers Insurance Company v. Seabolt, 361 S.W.2d 204 (Tex.Sup.1962), the

court defined total loss of use of a member as follows:

> "A total loss of the use of a member exists whenever by reason of injury, such member no longer possesses any substantial utility as a member of the body, or the condition of the injured member is such that the workman cannot procure and retain employment requiring the use of the member."

In view of appellant's contentions we must decide whether the evidence is sufficient—legally or factually—to support the finding that Frank Ovalle sustained " * * * total loss of use of his right leg which continued and will continue from October 21, 1968 for a period of one hundred fifteen (115) weeks. * * *" Under the *Seabolt* definition there are two concepts of the phrase "total loss of the use of a member." The first is where "such member no longer possesses any substantial utility as a member of the body." The second is where "the condition of the injured member is such that the workman cannot procure and retain employment requiring the use of the member." After reviewing the complete record in this case we have concluded that appellant's contentions must be sustained. Under the appropriate rules the evidence is not legally or factually sufficient to support the finding of the trial court that Ovalle sustained a total loss of use of his right leg for 115 weeks after October 21, 1968.

When we apply the *Seabolt* definition to the evidence in this case, it cannot be said that the evidence is either legally or factually sufficient to support a finding that for 115 consecutive weeks following October 21, 1968, Ovalle's leg no longer possessed "any substantial utility" as a member of his body. He obviously used the leg almost daily, returned to his old employment less than three months after the original injury and thereafter worked at his pre-injury employment until he left of his own volition. He subsequently obtained five other types of employment— chopping cotton, filling station work, making pipe connections, commercial painting and sandblasting, and tree-trimming and general work—none of which he left because of any physical impairment. He performed all repairs at his home and did his own yard work. The evidence strongly tends to establish that Ovalle's right leg did have some substantial utility as a member of his body for most of the period of 115 weeks after the accident and after he returned to work in January 1969. However, the award made by the trial court was based upon a total loss of use of Ovalle's leg rather than on a partial loss of use thereof.

The alternative requirement of *Seabolt* for a finding of total loss of use of a specific member is likewise not present here. The condition of Ovalle's leg was obviously not such that he could not procure and retain employment requiring the use of that member. The evidence is also legally and factually insufficient to support a finding in Ovalle's favor on that phase of the case. He obtained and retained several kinds of employment requiring the use of his leg, some of which paid better wages than he had previously earned. With reference to "retaining" the various jobs, Ovalle did not leave any of the post-injury jobs because of physical inability to perform his work. He left Sinton Electric Company in June because of a fight. He left his cotton-chopping job in West Texas because he wanted to return to Sinton. He left the filling station job because work got slow and he had been the last man hired. He left the job in Corpus Christi with the commercial painting company because he wanted to return to Sinton where he lived and to work for Mr. Benson at a better wage. He was fired from the job with Benson because of his failure to return a truck on time and otherwise possibly would still be working there today. Following his termination by Benson, he went back to work with A & R Pipe Company evi-

dencing again that he was not physically unable to obtain or retain employment and that he was not undesirable to various employers by reason of any physical impediment.

The fact situation in *Seabolt* involved the alleged total loss of use of a hand rather than a leg, but the decision is otherwise closely in point. There the employee returned to his old job within a week after the injury and continued until the job was finished. He received unemployment compensation for a while but at the time of trial and for six or eight weeks prior thereto had been employed as a pipefitter making a slightly higher wage than at the time of his injury. He had testified that he could not pull on wrenches as he used to, that he was not as accurate with a hammer because of a poor grip, that he had been transferred from one type of work to another which involved less use of the injured hand, that he favored his right hand and frequently had to change positions in order to use his uninjured hand. There was also testimony that he did in fact use his right hand and that his employer never complained of the caliber of his work.

The Supreme Court held in part that:

"* * * The testimony shows no more than an impairment in the use of the hand, i. e., a partial loss of the use, rather than a total loss of the use of the hand. The evidence did not call for a submission of the 'total loss of the use' theory. The case should have been submitted upon the basis of a partial rather than a total loss of the use of the hand."

The same reasoning is applicable here. There was no evidence in the record that Ovalle sustained a total loss of use of his right leg from October 21, 1968, through and beyond the date of trial on December 15, 1970. The testimony of Dr. Barnes does not alter that conclusion. Dr. Barnes did not give an opinion that Ovalle has been disabled continuously since October 21, 1968. He did not see Ovalle until November 20, 1970. In his opinion Ovalle was "100% disabled" at the time of trial. It is apparent that the doctor had not been advised of the type of work Ovalle had been doing or the manner in which he had accomplished it.

Since there is no medical testimony that Ovalle's leg did not possess any substantial utility as a member of his body continuously since October 21, 1968, and since all of the other evidence reflects that he was in fact able to and did retain various kinds of employment involving the use of his leg, the trial court's conclusion to the contrary has no support in the evidence.

A recent decision involving similar facts to those in *Seabolt* and here is Harris v. Texas Employers Insurance Association, 447 S.W.2d 211 (Tex.Civ.App., Beaumont, 1969, writ ref'd. n. r. e.). There Harris had burned his left leg, had been off work for about a month, and had thereafter returned to work at his regular job until discharged some two and a half years later. There, as here, a recovery was sought for a back injury in addition to the specific injury. There, as here, the general injury contention was rejected. Instead, the court found total loss of use of the left leg for 4$\frac{2}{7}$ths weeks and 30% permanent partial loss of use of the leg beginning upon the date the plaintiff returned to work. The Court of Civil Appeals reversed and remanded the case because the evidence was factually insufficient to support the finding of permanent partial loss of use. This result was reached notwithstanding the plaintiff's testimony that he was unable to do any kind of heavy work, that he was crippled in his left leg, that he couldn't put much weight on the leg, that he had to hop around on it, that he limped, that he could not use it as he used to, that he did not walk the way he used to and that it hurt him. The plaintiff had produced a co-worker who corroborated his inability to use his left leg and had called a medical doctor who testified to the presence of pain in the left leg, to poor use of the

left leg, to atrophy in the leg, and attributed all of this to the injury. The Court of Civil Appeals held that the evidence was legally sufficient to support the jury finding of partial loss of use of the left leg but concluded that the evidence was factually insufficient to support that finding.

In view of our foregoing holdings, the judgment of the trial court must be reversed. Although we have held that the evidence is legally, as well as factually, insufficient to support finding of fact number 5 made by the trial court that Ovalle sustained a total loss of use of his right leg for 115 weeks after October 21, 1968, we have concluded that the cause should be remanded for new trial. The evidence contained in the present record would have authorized an award to appellee—on the basis of partial disability of his right leg—for some amount in addition to that heretofore paid to him by appellant. We therefore remand in the interest of justice. Rule 434, Texas Rules of Civil Procedure. If we should be mistaken concerning our "no evidence" holding, we would, in any event, hold the evidence factually insufficient to support the finding as to total loss of use and upon reversal, would remand the cause for new trial.

Reversed and remanded.